UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                         )
LORI CHAPMAN,                            )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        Civil Action No.
                                         )
DESIMONE FARMS, INC.  and                )        _____
NECTARIOS FITZPATRICK,                   )
                                         )
                    Defendants.          )
_____)

## COMPLAINT AND JURY DEMAND

## PARTIES

1.      The Plaintiff, Lori Chapman ("Ms. Chapman" or the "Plaintiff"), is a 45-year-old

woman, born in 1977, and is a resident of the state of New York.  Ms. Chapman resides at 136

Bluebird Drive, Montgomery, New York 12549.  Montgomery, NY is in Orange County.

2.      Defendant Desimone Farms, Inc. ("Desimone") (the "Company") is a domestic

for-profit corporation doing business in the state of New York.  Desimone is incorporated in

New York and its principal office is in  Montgomery, New York 12549.

3.      Defendant Nectarios Fitzpatrick ("N. Fitzpatrick") (the Company and N.

Fitzpatrick, individually and collectively, the "Defendants") is an adult male who, upon

information and belief, resides in the state of New York.  Upon information and belief, at all

relevant times, N. Fitzpatrick was the Chief Executive Officer of the Company, including both

Desimone and Aden individually.

## JURISDICTION AND VENUE

4.     The court has subject matter jurisdiction under 28 U.S.C. §1331 because Ms. Chapman has brought a claim pursuant to Title VII (42 U.S.C. §§ 2000e et seq), the Americans with Disabilities Act ("ADA") (42 U.S.C. §§ 1201 et seq.), and the Age Discrimination in Employment Act (the "ADEA") ( 29 U.S.C. §§ 621 et seq.).  The court may exercise supplemental jurisdiction over Ms. Chapman's state law claims.  28 U.S.C. §1367.

5.     Venue is appropriate in the Southern District of New York as the acts or omissions giving rise to the claims in this Complaint occurred in the Southern District of New York.  Additionally, the Plaintiff resides within the Southern District of New York.

6.     This court has jurisdiction over the Defendants, including, but not limited to, because the Defendants are a resident of the State of New York.

7.     This Court has personal jurisdiction over Defendant Desimone because Desimone is a resident of the state of New York because it is both incorporated in the state of New York and has their principal places of business in New York.  Further, Desimone has engaged in and transacted business in the State of New York, including by managing and/or operating a business in New York and/or employing Ms. Chapman in New York, and Ms. Chapman's causes of action stem largely from Desimone's business transactions within the State of New York. Indeed, Ms. Chapman was employed by Desimone in the State of New York, was managed and supervised by Desimone in the State of New York, was discriminated against and harassed by Desimone in the State of New York and was terminated by Desimone in the State of New York.

8.     Further, this Court has personal jurisdiction over N. Fitzpatrick because N. Fitzpatrick is a resident of the state of New York.   Further, N. Fitzpatrick has engaged in and transacted business in the State of New York, including by managing and/or operating a business (Desimone) in New York and/or employing Ms. Chapman (via Desimone) in New York, and

Ms. Chapman's causes of action stem largely from N. Fitzpatrick's business transactions within the State of New York.  Indeed, Ms. Chapman was employed by Desimone (which was managed by N. Fitzpatrick) in the State of New York, was managed and supervised by N. Fitzpatrick in the State of New York, was discriminated against and harassed by N. Fitzpatrick in the State of New York and was terminated by N. Fitzpatrick in the State of New York.

## STATEMENT OF FACTS

1.      In or around September 2018, Ms. Chapman was interviewed by N. Fitzpatrick for a position with the Company, doing business as a Senior Sales Broker, in Montgomery, New York.

2.      During this interview, N. Fitzpatrick weirdly asked Ms. Chapman if she was married with kids.

3.      Although Ms. Chapman was uncomfortable with this line of questioning, she truthfully answered that she was married with a child.

4.      When Ms. Chapman answered, N. Fitzpatrick sighed with clear disappointment, seeming to make it clear that he wished that Ms. Chapman was single and without children.

5.      After this interview, Ms. Chapman was offered a position as Senior Sales Broker, which she started on or around October 1, 2018.

6.      At all relevant times, the Company employed 20 or more employees for 20 or more calendar weeks within the last 12 months.

7.      As such, at all relevant times, the Company was an employer under federal and state anti-discrimination laws.

8.      At all relevant times, Ms. Chapman was a qualified employee, and her job performance was satisfactory.

9.     In addition, at all relevant times, Ms. Chapman suffered from Generalized Anxiety Disorder ("GAD") and Major Depressive Disorder ("MDD").

10.     Ms. Chapman's GAD was and is a mental impairment that substantially limited one or more of her major life activities, including, but not limited to, her ability to socialize, sleep, eat, control her emotions, and concentrate.  Further, Ms. Chapman's GAD was and is a mental impairment that substantially limited one or more of her major bodily functions, including, but not limited to, her neurological functions.  Accordingly, at all relevant times, Ms. Chapman's GAD was (and still is) a disability under state and federal law and Ms. Chapman was disabled under the same.

11.     Ms. Chapman's MDD was and is a mental impairment that substantially limited one or more of her major life activities, including, but not limited to, her ability to socialize, sleep, eat, control her emotions, and concentrate.  Further, Ms. Chapman's MDD was and is a mental impairment that substantially limited one or more of her major bodily functions, including, but not limited to, her neurological functions.  Accordingly, at all relevant times, Ms. Chapman's MDD was (and still is) a disability under state and federal law and Ms. Chapman was disabled under the same.

12.     The Company did not know about Ms. Chapman's disabilities at the time that she was hired, although she later revealed these disabilities to the Company.

13.     Throughout Ms. Chapman's employment, Ms. Chapman regularly and routinely worked in excess of 40 hours per week and was not paid any overtime for the hours worked in excess of 40 hours.

14.     Indeed, Ms. Chapman was paid a weekly salary, plus commissions she received.

15.     Importantly, Ms. Chapman did not fall into any overtime exemptions under either Federal or New York law. Accordingly, at all relevant times, Ms. Chapman was eligible for, and was owed, overtime wages (time and a half his regular rate) for any hours worked over 40 hours per week.

16.     Indeed, until at least approximately March of 2021, Ms. Chapman arrived and started her morning tasks around 7:00 a.m. (or earlier) and her workday often extended until 4:30 p.m. or later in the performance of her duties.  Ms. Chapman generally was only able to take a half-hour lunch break during these days, and worked consistently throughout the remaining time each day without typically taking breaks.  Thus, she consistently worked at least 9 per day, at least 5 days per week.  Therefore, Ms. Chapman routinely worked at least 45 hours per week, and often more, but was not paid overtime for her hours worked in excess of 40 each week.

17.     Furthermore, throughout her employment, Ms. Chapman routinely performed additional work outside of normal business hours (early mornings, evenings, and weekends) and while at home, including completing paperwork and communications in the evenings in her residence related to sales strategies or completing sales paperwork and communications related to the performance of her job duties.

18.     Indeed, on average, Ms. Chapman performed an average of at least two hours of extra work outside of normal working hours, including having work related phone calls and completing paperwork.

19.     Shortly after being hired, it became clear that the Company fostered a male-dominated culture, with a preference for younger workers.

20.     For example, in or around 2019, N. Fitzpatrick indicated to Ms. Chapman that he assumed that Vicky Ascolese ("Ascolese"), another employee who (like Ms. Chapman) was over the age of 40, wouldn't be able use an application on her phone because she was "old."

21.     Upon information and belief, at the time of this comment, Ascolese was in her fifties.

22.     Upon information and belief, N. Fitzpatrick is younger than Ms. Chapman.

23.     Additionally, sexist comments that were denigrating to women were tolerated by management and were sometimes made by members of management.

24.     As an example, in or around January 2020, Cosmos Fitzpatrick ("C. Fitzpatrick"), the male President of the Company, sent a photograph to several colleagues, including Ms. Chapman, through the Company's email account.

25.     Upon information and belief, C. Fitzpatrick was in his twenties at the time he transmitted this image and, upon information and belief, was (and is) not disabled.

26.     In this photo distributed by C. Fitzpatrick, multiple male employees were pictured naked at a wedding, each wearing only a sock to cover his genitalia.

27.     Receiving a picture of naked male co-workers made Ms. Chapman uncomfortable, and she made it clear to C. Fitzpatrick that she did not welcome receiving the photograph.  However, the sexist and harassing conduct continued.

28.     Despite the culture of the Company, Ms. Chapman continued her exemplary performance.

29.     In or around the beginning of 2021, the Company undertook a hiring process for several vacant positions.

30.     During this process, Ms. Chapman asked Miriam Soule ("Soule"), Chief Operations Officer, how the interviews were progressing.

31.     Upon information and belief, Soule was approximately thirty years old at this time and, upon information and belief, was not disabled.

32.     Shockingly, Soule responded by asserting there were candidates with "lots of sales experience, but they're old."

33.     Based on the nature and tone of Soule's comment, it was clear she viewed the "old" age of these candidates' in a negative light, and was hesitant to hire these experienced candidates because of their age.

34.     Ms. Chapman responded by encouraging Soule, "don't discount older people. I'm older too."

35.     Soule responded, "We forget how old you are!"

36.     These and other comments by Soule made clear the Company's clear preference for younger employees over older employees.

37.     Indeed, during this hiring process in or around the beginning of 2021, most of the people hired were in their early twenties (despite there being multiple older candidates who were more qualified).

38.     In fact, upon information and belief, during Ms. Chapman's tenure with the Company, Ms. Chapman was the only person over forty years old who was hired by the Company, and the Company instead hired only employees under forty years old, and often in their 20's or early 30's.

39.     Alarmed by the clear preference for younger employees, in or around June 2021, Ms. Chapman raised protected concerns to C. Fitzpatrick (the President) and Soule that they

were discounting the value of older individuals and seemed to be discriminating against candidates who were over the age of twenty-five (and certainly against people who were over forty years old).

40.     After Ms. Chapman expressed her protected discrimination concerns, C. Fitzpatrick's attitude towards Ms. Chapman shifted in a decidedly negative manner.

41.     For example, C. Fitzpatrick began frequently and aggressively shouting at Ms. Chapman.  In addition, C. Fitzpatrick began setting different (and higher) standards for Ms. Chapman compared to other employees.

42.     Indeed, other, younger employees did not have to report to work at a specific time in the morning, whereas Ms. Chapman was required to be in the office by 7:30am and was told she needed to work in the office, rather than from home.

43.     Notably, similarly situated younger employees were permitted to work from home and were given flexible schedules.

44.     Importantly, Ms. Chapman's sales were excellent, so there was no performance-related reason for her to be treated differently than her similarly situated younger colleagues who did not have required hours in the office.

45.     Indeed, as evidence of her strong performance, in both October 2021 and November 2021, Ms. Chapman received the "Employee of the Month" distinction.

46.     At or around this time, Ms. Chapman was told that since she "kept winning," they would have to give it to someone else the following month.

47.     In or around November 2021, a contest was developed for employees who achieved a specific sales metric.

48.     The minimum metric for entry was set at $6,000 for every employee except Ms. Chapman, whose minimum was set at $10,000.

49.     As such, it was clear Ms. Chapman was given an unfairly higher metric than her coworkers who were younger and/or who had not raised protected concerns.

50.     Nevertheless, due to her excellent performance, Ms. Chapman won the contest.

51.     In or around December 2021, Ms. Chapman began suffering from a significant flareup of her MDD, which was seemingly exacerbated by the seasonal change to winter.

52.     In light of this flareup of her MDD, Ms. Chapman disclosed her disabilities (MDD and GAD) to Soule.

53.     In addition, given the severity of the flareup at that time, Ms. Chapman asked for the reasonable, disability-related accommodation of being permitted to work from home that day.

54.     Although Ms. Chapman was permitted to work at home on the day requested, her subsequent requests for the same reasonable accommodation (i.e., of sometimes working from home due to her disabilities) were denied.

55.     In or around January 2022, the Company announced it was considering implementing a policy wherein a "transactions fee" would be imposed, which would result in a certain amount of money being deducted from certain employees' paychecks based on the amount of sales each employee made.

56.     As Ms. Chapman had the most transactions, this policy disproportionately impacted Ms. Chapman, and indeed appeared to have been intended to purposefully negatively target Ms. Chapman for discriminatory and/or retaliatory reasons, including by reducing her compensation.

57.     In addition, as this transaction fee was imposed after the sale had been finalized and the commission earned, Ms. Chapman reasonably believed this policy constituted a violation of New York wage law.

58.     Given Ms. Chapman's concerns that this transaction fee policy appeared to violate New York law (including its wage laws), in or around January 2022, Ms. Chapman voiced protected concerns to the Company and/or Soule, including by raising concerns the potential transaction fee was illegal under New York wage law.

59.     Indeed, Ms. Chapman made it clear that, if this illegal policy was implemented and resulted in an improper deduction of her wages, she would have little choice but to pursue legal action (such as through the Department of Labor) to seek redress.

60.     Additionally, at or around the same time, the Company instituted a policy in which older employees who didn't match their base salary in commissions would be moved to a "commissions only" payment structure.

61.     Notably, despite younger employees not matching their base salary in commissions, they were not moved to a commission only payment structure.

62.     Indeed, upon information and belief, this policy impacted only Ascolese and Andy Hobbs ("Hobbs").

63.     Upon information and belief, Ascolese and Hobbs were both in their late-fifties or sixties.

64.     Ms. Chapman would have been impacted as well, but (due to her excellent performance) Ms. Chapman regularly matched (and, indeed, exceeded) her base salary in sales.

65.     Meanwhile, upon information and belief, younger employees who did not match their base salaries were not moved to a "commissions only" payment structure.  Thus, it was

clear that the Company was selectively enforcing this policy to negatively impact older employees compared to similarly situated younger employees.

66.     In or around the beginning of February 2022, Ms. Chapman raised protected concerns to C. Fitzpatrick, including by explicitly raising concerns regarding the discriminatory impact of the new policies on older employees and the illegal nature of the Company's proposed policies.

67.     Indeed, Ms. Chapman highlighted the unfairness of the policies, given the fact that the intent of these policies seemed to be directly targeting older employees (such as Ms. Chapman) and/or were not being applied evenly to younger salespeople, including those who were not matching their base salaries in sales.

68.     C. Fitzpatrick became irate in response to the discrimination concerns raised by Ms. Chapman and started yelling at her, asking who he should fire.

69.     C. Fitzpatrick's statements, tone, and manner of speaking made it clear he was incensed by Ms. Chapman raising protected discrimination concerns and was seeking to retaliate. Indeed, C. Fitzpatrick's tone and words made it clear that he was threatening Ms. Chapman's job.

70.     Towards the end of February 2022, Ms. Chapman had a prior-approved and long planned vacation to visit colleges with her daughter.

71.     Importantly, Ms. Chapman had timely put in the request for time off to attend these college visits with her daughter.

72.     Further, the Company had approved this time off request.

73.     During this vacation (for which she had previously requested and received approval), Steve Lam ("Lam"), Sales Manager, called Ms. Chapman seeking some work-related information.

74.     Importantly, as Ms. Chapman was on vacation and during the vacation was driving between colleges and walking around colleges with her daughter without easy access to her work technological equipment, she was not able to access the work-related information that Lam was interested in.

75.     Further, this information was readily available through other channels and Ms. Chapman explained this to Lam.

76.     Nevertheless, despite Ms. Chapman explaining that Lam could get this information elsewhere (and even directing Lam to this information), he contacted Ms. Chapman multiple times while she was on vacation.

77.     Notably, the Company did not contact younger, non-disabled employees on vacation (and certainly not contact them repeatedly).

78.     Furthermore, the Company did not have a policy or practice of requiring employees to work while on vacation, especially when any work issues were not emergencies and/or could be handled by others who were not on vacation.

79.     Indeed, for example, in or around the middle of 2021, Riley Carney ("Carney"), who was approximately twenty-seven years old at that time, took an unprotected extended leave from the Company.

80.     Despite the unexpected nature of the leave, upon information and belief, Carney was not repeatedly contacted by management for work related reasons and was not asked for any information or help while on leave.

81.    On or around February 28, 2022, after returning from her preapproved vacation, Ms. Chapman returned to the office and was speaking with Soule in her (Soule's) office.

82.    During this conversation, Ms. Chapman reiterated that she suffered from GAD and that her GAD was significantly flaring over the past week.

83.    Later that same day, Ms. Chapman was contacted by Lam.

84.    During this discussion, Lam suddenly and unexpectedly informed Ms. Chapman that she was being terminated for allegedly "being unhappy."

85.    Importantly, Ms. Chapman was not any more noticeably "unhappy" than her younger, nondisabled coworkers.

86.    Furthermore, to the extent anyone at the Company believed that Ms. Chapman was more noticeably "unhappy" than her coworkers (which she was not), Ms. Chapman suffered from MDD and GAD, which she had disclosed to the Company, and had asked for the Company to be understanding related to the emotion and mood-related symptoms caused by flare-ups of these disabilities.

87.    As such, it appeared the reason given by the Company for Ms. Chapman's termination was directly related to her disabilities, which had been disclosed to upper management, and further constituted a denial of a disability-related accommodation previously requested by Ms. Chapman.

88.    Additionally, citing an emotion as the reason for her termination is not only trivial, but also clearly motivated by the gender-related stereotype of women being overly "emotional" and the idea that women should smile and project "happiness" and "agreeableness" when interacting with men.

89.    Furthermore, Ms. Chapman received no discipline prior to her termination.

90.     Indeed, prior to her termination, Ms. Chapman's performance was regularly lauded as exemplary, including as recently as November 2021, when Ms. Chapman was commended as the "Employee of the Month."

91.     In addition, other younger, male, and/or nondisabled employees acted in a manner that indicated a lack of happiness and/or in an otherwise disagreeable manner and these employees were not fired for such behavior.

92.     Upon information and belief, Ms. Chapman was replaced with a younger, nondisabled, male employee.

93.     On or around July 1, 2022, Ms. Chapman timely filed a Charge of Discrimination (the "Charge") with the New York State Division of Human Rights ("NYSDHR") (Charge No. 10217992) and the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 16GC202988).

94.     On or around October 24, 2022, Ms. Chapman requested an administrative convenience dismissal from the NYSDHR.

95.     On or around November 20, 2022, the NYSDHR released its jurisdiction.

96.     Ms. Chapman subsequently notified the EEOC of her intent to file a complaint in court and, accordingly, requested that the EEOC provide a right to sue letter and permit Ms. Chapman to file in court.

97.     The EEOC issued a Right to Sue on or around February 8, 2023.

98.     This Complaint is timely filed in compliance with the timeframes of relevant laws and requirements.

**COUNT I**

**(Disability Discrimination and Failure to Accommodate in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. Chapman v. Defendants (Desimone and N. Fitzpatrick)**

99.     Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

100.     At all relevant times, the Company was an employer in the State of New York, including because they employed employees in the State of New York.

101.     The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

102.     Ms. Chapman suffers (and at all relevant times suffered) from disabilities, including, MDD and GAD.  Each of these disabilities, both individually and collectively, are impairments that substantially limit one or more of her major life activities, including, but not limited to, concentrating, socializing, sleeping, and caring for herself.  Ms. Chapman's MDD and GAD are further impairments that further substantially limit the operation of one or more of Ms. Chapman's major bodily functions, including, but not limited to, her neurological functions. Accordingly, Ms. Chapman's GAD and MDD are and at all relevant times were disabilities under the NYSHRL and Ms. Chapman was (and is) disabled under the same.

103.     At all relevant times, Ms. Chapman was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

104.     Ms. Chapman disclosed her disabilities to the Defendants, and/or the Defendants were aware of Ms. Chapman's disabilities, and/or the Defendants regarded Ms. Chapman as disabled.

105.     Ms. Chapman requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.

These requested reasonable accommodations included, but were not limited to, the ability to work from home and/or having time off from work for treatment of her disabilities.

106.     The disability-related accommodations requested by Ms. Chapman did not pose an undue burden on the Defendants.

107.     The Defendants failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

108.     The Defendants unlawfully denied, and/or eventually revoked, one or more of Ms. Chapman's disability-related accommodation requests.

109.     The Defendants discriminated against Ms. Chapman due to her disabilities by subjecting Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

110.     Non-disabled employees of the Company were treated more favorably than Ms. Chapman including through not being improperly harassed, criticized, and/or not being terminated.

111.     Upon information and belief, the Company replaced Ms. Chapman with a lesser or similarly qualified, non-disabled employee.

112.     The Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Chapman and/or conduct so reckless to amount to such disregard.

113.     As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

114.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, punitive damages, injury to reputation, interest, attorneys' fees, and costs.

## COUNT II

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

### Ms. Chapman v. the Company

115.     Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

116.    During all relevant times, the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

117.    Ms. Chapman suffers (and at all relevant times suffered) from disabilities, including, MDD and GAD.  Each of these disabilities, both individually and collectively, are impairments that substantially limit one or more of her major life activities, including, but not limited to, concentrating, socializing, sleeping, and caring for herself.  Ms. Chapman's MDD and GAD are further impairments that further substantially limit the operation of one or more of Ms. Chapman's major bodily functions, including, but not limited to, her neurological functions.

Accordingly, Ms. Chapman's GAD and MDD are and at all relevant times were disabilities under the ADA and Ms. Chapman was (and is) disabled under the same.

118.    At all relevant times, Ms. Chapman was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

119.    Ms. Chapman disclosed her disabilities to the Defendants, and/or the Defendants were aware of Ms. Chapman's disabilities, and/or the Defendants regarded Ms. Chapman as disabled.

120.    Ms. Chapman requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, the ability to work from home and/or having time off from work for treatment of her disabilities.

121.    The disability-related accommodations requested by Ms. Chapman did not pose an undue burden on the Defendants.

122.    The Defendants failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

123.    The Defendants unlawfully denied one or more of Ms. Chapman's disability-related accommodation requests.

124.    The Defendant discriminated against Ms. Chapman due to her disabilities by subjecting Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

125.     Non-disabled employees of the Company were treated more favorably than Ms. Chapman including through not being improperly harassed, criticized, and/or not being terminated.

126.     Upon information and belief, the Company replaced Ms. Chapman with a lesser or similarly qualified, non-disabled employee.

127.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Chapman.

128.     As a direct and proximate result of the Company's violation of the ADA, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

129.     Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorneys' fees, and costs.

**Count III**

**(Discrimination Based on Age in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. Chapman v. the Defendants**

130.     Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

131.    At all relevant times, the Company was an employer in the State of New York, including because they employed employees in the State of New York.

132.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL")

133.    At all relevant times, Ms. Chapman was over 40-years old.

134.    The Company, by and through its agents, harassed and discriminated against Ms. Chapman with respect to her compensation, terms, conditions, or privileges of employment because of Ms. Chapman's age (currently 45) and/or because Ms. Chapman was an older, disabled employee and/or was an older, female employee ("age plus" discrimination).

135.    More specifically, the Company subjected Ms. Chapman to adverse actions because of her age and/or because she was an older individual who was also disabled and/or a woman, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

136.    The Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Chapman and/or conduct so reckless to amount to such disregard.

137.    As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary damages, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

138.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay),

damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, punitive damages, attorneys' fees, interest, and costs.

**COUNT IV**

**(Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)**

**Ms. Chapman v. the Company**

139.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

140.    At all relevant times, Ms. Chapman was over 40 years old.

141.    During all relevant times, the Company was an employer under definition of the Age Discrimination in Employment Act, 29 U.S.C. §§621 et. seq. (hereinafter the "ADEA") because it employed more than 20 persons for 20 or more calendar weeks within the previous 12-month period.

142.    At all relevant times, Ms. Chapman was over 40-years old.

143.    The Company, by and through its agents, harassed and discriminated against Ms. Chapman with respect to her compensation, terms, conditions, or privileges of employment because of Ms. Chapman's age (currently 45) and/or because Ms. Chapman was an older, disabled employee ("age plus" discrimination).

144.    More specifically, the Company subjected Ms. Chapman to adverse actions because of her age and/or because she's and older, disabled individual, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of

one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

145.    The Company willfully violated the ADEA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Chapman.

146.    As a direct and proximate result of the Company's violation of the ADEA, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

147.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated damages, interest, attorney's fees, and costs.

**COUNT V**

**(Sex Discrimination and Harassment in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. Chapman vs. Defendants (Desimone and N. Fitzpatrick)**

148.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

149.    Defendants, including, through their agents, harassed and discriminated against Ms. Chapman with respect to her compensation, terms, conditions, or privileges of employment, because of the Plaintiff's sex and/or because Ms. Chapman was an older woman (i.e., sex plus).

150.    More specifically, and by way of illustration, Defendants subjected Ms.

Chapman to adverse actions because of her sex and/or because she was an older woman, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

151.    In addition, Defendants subjected Ms. Chapman to sexually harassing behavior, including, but not limited to, by making inappropriate and braggadocios comments about their genitalia and sending Ms. Chapman a picture of various male coworkers nude with merely a sock covering their genitalia.

152.    Upon information and belief, Ms. Chapman was replaced by a lesser or similarly qualified male.

153.    The Defendants' actions against Ms. Chapman were wanton, willful and malicious.  The Defendants acted willfully and/or with reckless disregard to the state protected rights of Ms. Chapman.

154.    As a direct and proximate result of the Defendants' violations of NYSHRL, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

155.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

**COUNT VI**

**(Sex Discrimination and Harassment in Violation of Title VII)**

**Ms. Chapman vs. the Company**

156.     Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

157.     The Company, including, through their agents, harassed and discriminated against the Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of the Plaintiff's sex and/or because the Plaintiff is an older woman.

158.     More specifically, and by way of illustration, the Company subjected Ms. Chapman to adverse actions due to her sex and/or because she is an older woman, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

159.     In addition, Defendants subjected Ms. Chapman to sexually harassing behavior, including, but not limited to, by making inappropriate and braggadocios comments about their genitalia and sending Ms. Chapman a picture of various male coworkers nude with merely a sock covering their genitalia.

160.     Upon information and belief, Ms. Chapman was replaced by a lesser or similarly qualified male.

161.     The Company acted with willful and/or with reckless disregard to the federally protected rights of Ms. Chapman.

162.     Defendant's actions were wanton, malicious, or oppressive.

163.    As a direct and proximate result of the Company's violations of Title VII, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

164.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

## COUNT VII

**(Retaliation in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)**

**Ms. Chapman v. the Defendants (Desimone and N. Fitzpatrick)**

165.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

166.    Ms. Chapman engaged in protected activity under the NYSHRL, including, but not limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Defendants due to Ms. Chapman's disabilities, sex, and/or age; (ii) requesting and utilizing reasonable accommodations for disabilities which were intended to allow Ms. Chapman to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected

activity related to the failure of the Defendants to provide disability-related reasonable accommodations.

167.    The Defendants discriminated against and/or retaliated against Ms. Chapman for opposing one or more acts or practices made unlawful by the NYSHRL, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

168.    The Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Chapman's exercising of or enjoyment of rights granted by the NYSHRL.

169.    The Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Chapman and/or conduct so reckless to amount to such disregard.

170.    As a direct and proximate result of the Defendants' violation of the NYSHRL, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

171.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, punitive damages, injury to reputation, interest, attorneys' fees, and costs.

# COUNT VIII

## (Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)

## Ms. Chapman v. The Company

172.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

173.    Ms. Chapman engaged in protected activity under the ADA, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Chapman's disabilities; (ii) requesting reasonable accommodations for disabilities which were intended to allow Ms. Chapman to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of the Company to provide disability-related reasonable accommodations.

174.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Chapman's exercising of, or enjoyment of, one or more rights granted by the ADA.

175.    More specifically, the Company subjected Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

176.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Chapman.

177.    As a direct and proximate result of the Company's violation of the ADA, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

178.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorneys' fees, and costs.

## COUNT IX

**(Retaliation in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)**

**Ms. Chapman v. the Company**

179.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

180.    Ms. Chapman engaged in protected activity under the ADEA, including, but not limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity regarding a hostile work environment based on age and/or (ii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Defendants due to Ms. Chapman's age.

181.    The Company discriminated against and/or retaliated against Ms. Chapman for opposing, voicing protected concerns, and/or engaging in other protected activity related to one or more practices made unlawful by the ADEA by subjecting Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work

environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

182.     The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Chapman's exercising of, or enjoyment of, one or more rights granted by the ADEA.

183.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Chapman.

184.     As a direct and proximate result of the Company's violations of the ADEA, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

185.     Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated damages, attorneys' fees, interest, and costs.

**COUNT X**

**(Retaliation in Violation of 42 U.S.C. §§ 2000e et seq.)**

**Ms. Chapman v. the Company**

186.     Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

187.    Ms. Chapman opposed a practice made unlawful by Title VII, including by opposing sexual harassment and discrimination based on her sex, opposing unlawful conduct, and expressing protected concerns regarding the sexually harassing and discriminatory actions of the Company and its employees.

188.    The Company discriminated against and/or retaliated against Ms. Chapman for opposing one or more practices made unlawful by Title VII, including, but not limited to, by subjecting Ms. Chapman to adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

189.    The Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Chapman.

190.    As a direct and proximate result of the Company's violations of Title VII, Ms. Chapman has suffered and continue to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

191.    Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

**Count XI**

**(Failure to Pay Overtime in Violation of New York State Law, NY Labor Law §651(5)(b))**

**The Plaintiff vs. the Company**

192.    Ms. Chapman incorporates all paragraphs above and below as if set forth fully herein.

193.    Ms. Chapman was employed by the Company.

194.    Ms. Chapman was a non-exempt worker and routinely worked in excess of 40 hours per week. Indeed, Ms. Chapman regularly worked in excess of 50 hours per week.

195.    For example, until at least approximately March of 2021, Ms. Chapman arrived and started her morning tasks around 7:00 a.m. (or earlier) and her workday often extended until 4:30 p.m. or later in the performance of her duties.  Ms. Chapman generally was only able to take a half-hour lunch break during these days, and worked consistently throughout the remaining time each day without typically taking breaks.  Thus, she consistently worked at least 9 per day, at least 5 days per week.  Therefore, at least until March of 2021, Ms. Chapman routinely worked at least 45 hours per week, and often more, but was not paid overtime for her hours worked in excess of 40 each week.

196.    Furthermore, throughout her employment, Ms. Chapman routinely performed additional work outside of normal business hours (early mornings, evenings, and weekends) and while at home, including completing paperwork and communications in the evenings in her residence related to sales strategies or completing sales paperwork and communications related to the performance of her job duties.

197.     Indeed, on average, Ms. Chapman performed an average of at least two hours of extra work outside of normal working hours, including having work related phone calls and completing paperwork.

198.     Despite this, Ms. Chapman was not paid any wages for these additional hours worked, which were often hours worked in excess of 40 hours.

199.     Importantly, Ms. Chapman did not fall into any overtime exemptions under either Federal or New York law. Accordingly, at all relevant times, Ms. Chapman was eligible for, and was owed, overtime wages (time and a half his regular rate) for any hours worked over 40 hours per week.

200.     Defendants were aware that Ms. Chapman was a nonexempt employee and Defendants suffered and/or permitted Ms. Chapman to work in excess of 40 hours per week.

201.     Defendants knowingly and willfully did not pay Ms. Chapman all overtime wages owed in violation of the New York Labor Law §651(5)(b).

202.     As a direct and proximate result of the Defendants' violations of the New York State Wage Law, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

203.     Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, damages for his lost compensation (including, but not limited to, back pay), liquidated damages, interest, attorney's fees, and costs.

**COUNT XII**

**(Failure to Pay Overtime in Violation of 29 U.S.C. §§ 201 et seq.)**

**Plaintiff v. Defendants (the Company and N. Fitzpatrick)**

204.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

205.    At all relevant times, the Company was an enterprise as defined under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (hereinafter, "FLSA").

206.    Indeed, at all relevant times, the Company had annual gross volume of sales made or business done greater than or equal to $500,000.

207.    Furthermore, at all relevant times, the Company was an enterprise engaged in interstate commerce.

208.    Additionally, during all relevant time periods, Ms. Chapman was an employee who was engaged in interstate commerce.

209.    Ms. Chapman was not exempt under the FLSA and equivalent state law, and as such was owed overtime pay of 1.5x her base rate when she worked more than 40 hours per week.

210.    The Defendants were aware that Ms. Chapman was a non-exempt employee under the FLSA and equivalent state law and willfully failed to pay Ms. Chapman the wages she was owed.

211.    The Company scheduled Ms. Chapman to work more than 40 hours per week and Ms. Chapman did in fact frequently work more than 40 hours per week.

212.    Ms. Chapman was not paid anything extra for the overtime hours she worked, as she received no extra pay for working overtime hours.

213.    As such, the Defendants paid Ms. Chapman less than the wages owed to her under the FLSA and equivalent state law.

214.     N. Fitzpatrick is a corporate officer and/or manager of the Company and exercised significant operational control over the Company (and the Plaintiff), including because he had the power to hire and/or fire employees, the power to determine salaries and the responsibility to maintain employment records. As such, N. Fitzpatrick is individually liable under the FLSA.

215.     The Defendants knowingly and willfully failed to pay Ms. Chapman all pay that she was owed in violation of the FLSA.

216.     As a direct and proximate result of the Defendants' violations of the FLSA, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost wages.

217.     Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost wages, liquidated damages in the amount of the lost wages for a knowing and willful violation of the FLSA, interest on the lost wages and liquidated damages, attorneys' fees, and costs.

## COUNT XIII

### (Whistleblower Retaliation – N.Y. Lab. Law § 215)

### Plaintiff v. Defendants (Desimone and N. Fitzpatrick)

218.     The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

219.     At all relevant times, the Company was an employer under the definitions of the New York Labor Laws, including N.Y. Lab. Law § 215.

220.     At all relevant times, N. Fitzpatrick was a person as defined by the New York Labor Laws, including N.Y. Lab. Law § 215.  In addition, N. Fitzpatrick served as an agent of the Company and an Officer of the Company during all relevant times.

221.     Ms. Chapman engaged in protected activity under N.Y. Lab. Law § 215, including when Ms. Chapman raised concerns regarding the Company's planned policy to charge transaction fees on each sale made, which would be an improper deduction under state law.

222.     The Defendants, including by and through their agents, retaliated and/or discriminated against Ms. Chapman for engaging in the above protected activity by subjecting Ms. Chapman to one or more adverse actions, including, but not limited to, subjecting Ms. Chapman to a harassing and otherwise hostile work environment, the denial of one or more reasonable accommodation requests, heightened goals, and/or the termination of Ms. Chapman's employment.

223.     As a direct and proximate result of the Defendants' actions, Ms. Chapman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

224.     Ms. Chapman seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, liquidated damages, interest, attorney's fees, and costs.


WHEREFORE, the Plaintiff, Lori Chapman, respectfully requests that this honorable court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay),

D.  Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E.  Award the Plaintiff emotional distress damages;

F.  Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff her reasonable attorneys' fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

LORI CHAPMAN

By her attorneys,

THE LAW OFFICES OF WYATT & ASSOCIATES P.L.L.C

Date:   February 8, 2023          By:   */s/ Michael R. Varraso*

Michael R. Varraso
mvarraso@wyattlegalservices.com
NY State Bar: 5619291
NDNY No.: 701795

Benjamin J. Wyatt

BWyatt@Wyattlegalservices.com
NY State Bar: 5604590
NDNY No.: 700752


The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868

New York Office:
418 Broadway, 2nd Floor
Albany, NY 12207